UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIDE, INC.,<br><br>       Plaintiff,<br><br>    v.<br><br>OFFICIAL PARTNERS NEW YORK, LLC, et al.,<br><br>       Defendants. | Case No. 24-cv-07135-WHO<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND GRANTING PRELIMINARY INJUNCTION**<br><br>Dkt. Nos. 25, 37, 53 |

      This order addresses two motions: the defendants' Motion to Compel Arbitration and the plaintiff's request for a preliminary injunction. In the underlying complaint, plaintiff Side, Inc. ("Side") alleges that corporate defendant Official Partners New York, LLC ("Official Partners"), and individual defendants Tal and Oren Alexander (the "Alexanders") (altogether, "the defendants") breached the terms of the Amended and Restated Promissory Note and the Amended and Restated Security Agreement (the "Restated Agreements"). The Restated Agreements put the Alexanders' assets up as collateral against Official Partners' $5,000,000 loan from Side. Because these assets (hereafter, the "Collateral") are at risk of dissipation during the pendency of this lawsuit, I entered a preliminary injunction protecting them shortly after the hearing on the motions. *See* Dkt. No. 58.

      This order expands on the basis for the injunction and DENIES defendants' motion to compel arbitration. The defendants argue that the Restated Agreements (which contain exclusive jurisdiction provisions granting this court jurisdiction) are void as illegal contracts and that the arbitration clause found in the parties' Master Services Agreement controls. But Side's claims are rooted in the Restated Agreements, not the Master Services Agreement, and the Restated Agreements are not illegal contracts. The Restated Agreements' exclusive jurisdiction provisions

control, and the case belongs here.

**BACKGROUND**

### A. The Contracts

On August 2, 2021, the Alexanders entered into the first Master Services Agreement ("MSA") with Side. The MSA required the Alexanders to affiliate their real estate licenses with Side as their supervising broker. The MSA was to continue until terminated and governed "all disputes and claims between [Side and the Alexanders] connected with their relationship under the MSA." Dkt. No. 37-1, Ex. 1. It contained an arbitration clause extending to all claims arising from or connected in any way to the MSA. *Id.*

On August 1, 2022, the parties executed the First Amended MSA, which added the Alexanders' company, Official Partners, as a party to the Agreement. Dkt. No. 37-1, Ex. 4 (First Amended MSA). The First Amended MSA also anticipated a promissory note that would be executed between Side and the defendants. It provided, in relevant part:

> "Concurrent with execution of this First Amendment, Side and Client shall execute a promissory note (the "Note") under which Side shall advance $5,000,000 to be repaid by Client with interest at the current Applicable Federal Rate (AFR). Repayment shall commence one (1) year after execution and the Note shall be repaid in full three (3) years after execution. The Note shall be secured against the assets of Tal Alexander and Oren Alexander. The Note shall be immediately due in full if Tal Alexander or Oren Alexander disassociate their real estate licenses from Side or the MSA is otherwise terminated."

*Id.* at ¶ 9.

On August 11, 2022, ten days after the First Amended MSA was executed, Side issued the Initial Promissory Note to Official Partners. It was secured by a guarantee by the Alexanders, which was memorialized in a separate Security Agreement.

Defendants failed to make the first payment, which was due on August 11, 2023. The missed payment prompted the parties to negotiate and enter into the Amended and Restated Secured Promissory Note, and the Amended and Restated Security Agreement, or the "Restated Agreements". Per the terms of the Restated Agreements, Side waived the Event of Default under the initial note and the parties agreed that the aggregate unpaid principal and accrued interest under the initial note would total the principal of the Amended and Restated Promissory Note. *See* Complaint ("Compl.") [Dkt. No. 1] ¶ 18; Dkt. No. 37-1, Ex. 2 (Amended and Restated Promissory

Note, or the "Note").

Both of the Restated Agreements contain exclusive jurisdiction clauses providing that all claims arising from or in connection to the Restated Agreements are subject to the exclusive jurisdiction of San Francisco courts. They also provide that in the event of inconsistencies between the terms of the Note or Security Agreement and other documents to which the parties are subject (including the MSA), the terms of the Restated Agreements shall prevail. The pertinent clauses read in part:

> **Conflicting Agreements**. In the event of any inconsistencies between the terms of this Note, the Security Agreement and the terms of any other document related to the loan evidenced by this Note (including the MSA), the terms of this Note shall prevail. . . .
> **Governing Law**: This Note shall be construed in accordance with the laws of the State of California (without regard to its choice-of-law provisions). All claims, controversies or disputes arising under or in connection with this Note will be subject to the exclusive jurisdiction of the state and federal courts located in San Francisco County, California.

Note ¶¶ 9, 12; Dkt. No. 37-1, Ex. 3 (Amended and Restated Security Agreement, or "Security Agreement"), ¶ 5(l), 5(n).

The Note contemplates specific, independent "events of default," the occurrence of any one of which would render the balance of the Note immediately due. The Events of Default clause states:

> **Events of Default**. Notwithstanding the foregoing, the entire Balance shall become immediately due and payable upon the earliest of (each such event, an "Event of Default"):
> (a) the termination of the Master Services Agreement, dated as of August 2, 2021 by and among the Company and Tal Alexander, Oren Alexander and Richard Jordan and as amended by that certain First Amendment to Master Services Agreement dated August 1, 2022, that certain Second Amendment to Master Services Agreement dated June 7, 2023, and that certain Third Amendment to Master Services Agreement dated April 18, 2024 (as may be amended from time to time, the "MSA");
> (b) the date either Tal Alexander or Oren Alexander (each, an "Guarantor," and collectively, the "Guarantors") either (i) disassociate their real estate licenses in any jurisdiction from the Company[1] or (ii) associate their real estate license in any jurisdiction with a brokerage other than the Company or a Company subsidiary or affiliate;
> (c) the date any of the following occurs without the prior written consent of the Company: (i) OT Official Inc. is no longer wholly owned by Tal Alexander; (ii) TO Official Inc. is no longer wholly owned by Oren Alexander; (iii) OT Official Inc. or TO Official Inc.

---

[1] Per the terms of the Note, "the Company" refers to Side.

3

> (collectively, the "Holding Entities") dispose of any portion of their respective membership interests in the Borrower; (iv) the Borrower issues any debt securities; or (v) the Borrower issues any equity securities of the Borrower such that the Holding Entities collectively cease to hold a majority of the membership interests in the Borrower; (d) the failure of the Borrower to pay when due the Balance (or any portion thereof) under this Note;
> (e) the Borrower's failure to perform any obligation or agreement contained in this Note or the Guarantors' failure to perform any obligation or agreement contained in the Security Agreement (as defined below) (collectively, the "Obligations");
> (f) the filing of a petition by or against the Borrower or the Guarantors under any provision of the Bankruptcy Reform Act (Title 11 of the United States Code), as amended or recodified from time to time, or under any other law relating to bankruptcy, insolvency, reorganization or other relief for debtors;
> (g) the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of the Borrower or the Guarantors;
> (h) the execution by the Borrower or the Guarantors of a general assignment for the benefit of creditors;
> (i) the insolvency of the Borrower or the Guarantors, or the Borrower's or the Guarantors' failure to pay any of their respective debts greater than $1,000 as they become due;
> (j) the breach by the Borrower or any of the Guarantors of any term of this Note or the Security Agreement, as applicable, including the confidentiality provisions hereof; or
> (k) the discovery that any representation or warranty made by the Borrower or any of the Guarantors in this Note or the Security Agreement is incorrect, false or misleading in any material respect.

Note § 3.

The Security Agreement provides that any "Event of Default" under the Note would *also* amount to a default under the Security Agreement. Dkt. No. 37-1, Ex. 3 § 4(a). The Security Agreement also lays out the Alexanders' obligations with respect to their assets as collateral for Official Partners' loan from Side, as shown below:

> **Representations and Warranties**. Each Guarantor represents and warrants to the Company that: (a) each Guarantor is the owner of the applicable Collateral (or, in the case of after-acquired Collateral, at the time each Guarantor acquires rights in the applicable Collateral, will be the owner thereof) and that no other Person has (or, in the case of after-acquired Collateral, at the time each Guarantor acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the applicable Collateral, other than Permitted Liens; (b) upon the filing of UCC-1 financing statements in the appropriate filing offices, the Company has (or in the case of after-acquired Collateral, at the time each Guarantor acquires rights therein, will have) a perfected security interest in the applicable Collateral to the extent that a security interest in the applicable Collateral can be perfected by such filing, except for Permitted Liens; (c) all payment intangibles are genuine and enforceable against the party obligated to pay the same; (d) the originals of all documents evidencing all

> accounts receivable and payment intangibles of each Guarantor and the only original books of account and records of each Guarantor relating thereto are, and will continue to be, kept at the address of each Guarantor set forth on the signature page of this Security Agreement; and (e) this Security Agreement, when executed and delivered by each Guarantor, shall constitute valid and binding obligations of each Guarantor, enforceable in accordance with its terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity.

Security Agreement § 2. Section 3 of the Security Agreement describes the Alexanders' "Covenants Relating to Collateral":

> **Covenants Relating to Collateral**. Each Guarantor hereby agrees: (a) to perform all acts that may be necessary to maintain, preserve, protect and perfect the applicable Collateral, the Lien granted herein and the perfection of such Lien, except for Permitted Liens; (b) not to use or permit any applicable Collateral to be used (i) in violation in any material respect of any applicable law, rule or regulation, or (ii) in violation of any policy of insurance covering the applicable Collateral; (c) to pay promptly when due all taxes and other governmental charges, all Liens (other than Permitted Liens) and all other charges now or hereafter imposed upon or affecting any applicable Collateral; (d) without written notice to the Company, not to change each Guarantor's name or residence (or, if a Borrower has more than one place of residence, its primary residence), or the office in which a Guarantor's records relating to accounts receivable and payment intangibles are kept; (e) to procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by the Company to perfect, maintain and protect its Lien hereunder and to deliver promptly upon the request of the Company all originals of applicable Collateral consisting of instruments.

*See id.* § 3.

### B. Events Giving Rise to Litigation

According to the Complaint, Official Partners defaulted on the Note on June 12, 2024, and again on June 25, 2024, when first Oren and then Tal Alexander's real estate licenses were disassociated from Side, triggering an Event of Default per the terms of the Note. Compl. ¶ 51; Note §§ 3-4. Official Partners allegedly directed the disassociation of the Alexanders' real estate licenses from Side "with full awareness and consent of the Alexanders" after reports surfaced that lawsuits concerning sexual assaults had been filed against the Alexanders, which apparently caused them to "step down" from Official Partners. Compl. ¶ 29. On June 12, 2024, Official Partners' CEO emailed Side's Director of Partner Success, copying Official Partners' "key

5

decision makers," including Tal Alexander, stating: "This email is to confirm that OFFICIAL/Side shall drop Oren Alexander's Florida and New York real estate licenses effective immediately. Oren has been informed of this decision." Declaration of Guy Gal ("Gal Decl.") [Dkt. No. 45-10] ¶¶ 4-6, Ex. A (email). Side processed Oren Alexander's license disassociation the same day. Compl. ¶ 29. The next day, Side's CEO allegedly spoke with Oren Alexander twice, and during those conversations, Oren Alexander purportedly confirmed that he had agreed to disassociate his licenses. *Id.* ¶ 30. On June 25, 2024, Tal Alexander issued a statement through his attorney that "Tal and his partners have decided he will take a leave from" Official Partners; that statement appeared in an article for *Business Insider*. *Id.* ¶ 32. That same day, Side's CEO and Official Partners' CEO spoke; Official Partners' CEO allegedly directed that Side process Tal Alexander's license disassociation from Official Partners, which Side did. *Id.*

On July 18, 2024, Side officials met with Official Partners' "key decision makers," including the Alexanders; during that meeting, Side's Chief Financial Officer informed Official Partners that it was in default under the Note, and that Side would be sending a demand letter to Official Partners explaining that Official Partners' decision to disassociate the Alexanders' licenses from Side—which Side says was done with the Alexanders' knowledge and consent— was an Event of Default under the Note and that the full Balance of the Note was due. *Id.* ¶ 33.

Pursuant to § 5 of the Note, Side declared the balance of the Note due and payable on July 22, 2024. Compl. ¶ 55; Note § 5. It issued Notices of Default and Demand for Payment to Official Partners and the Alexanders as Guarantors for the loan, stating that the entire balance on the Note was immediately due and payable. It demanded payment within one week, on July 29, 2024. The Alexanders did not pay and rejected Side's demands outright on July 30, 2024; among their justifications for refusal was that Side had "unilaterally" disassociated the Alexanders' licenses. *See* Cinque Decl. ¶ 4, Ex. 7 (email from the Alexanders' former counsel, James Cinque, to plaintiff's counsel, Catherine Kevane, asserting that Side's statement that the Alexanders "disassociated" their real estate licenses was false because Side was the one who unilaterally disassociated the Alexanders' licenses and the Alexanders had not agreed to the disassociation). Throughout August 2024, the Alexanders repeatedly refused to provide assurances that they were

6

maintaining the Collateral as required by the Security Agreement. *See* Compl. ¶¶ 51-53.[2]

According to Side, when the defendants "refus[ed] to provide assurances that the Guarantors had performed 'all acts necessary to maintain, preserve, protect and perfect the applicable Collateral, the lien granted herein and the perfection of such lien'" per § 3(a) of the Security Agreement, and refused to deliver to Side a list of Collateral per § 3(e), they breached the terms of the Restated Agreements. Compl. ¶ 52.  This purported breach prevented Side from exercising its right under the Note to "dispose of the Collateral by public or private sale" or "accept the Collateral in full payment of the Note and all other indebtedness secured" by the Security Agreement. *See* Note § 5.  As of October 10, 2024, the Balance of the Note totaled $4.2 million, and will apparently continue to accrue interest each day per § 4 of the Note. Compl. ¶ 58.

Side filed the underlying complaint on October 11, 2024, asserting two claims for breach of contract: the first against all defendants, and the second solely against the Alexanders as Guarantors of the loan.  *See generally*, Compl.

### C. Procedural History

After Side filed the Complaint, it tried to serve the defendants at the address listed in the Security Agreement and learned that the Collateral was not located there.  Side emailed the defendants' lawyer asking for clarification about where the Collateral was located. *See* Ex Parte Application for TRO [Dkt. No. 20] Section II; Kevane Decl., Ex. O.  It reached out to the defendants about this issue at least three times.  Ultimately, it filed the request for a temporary restraining order ("TRO") and preliminary injunction.

I held a hearing on the TRO on November 8, 2024.  Counsel for Side and the defendants appeared.  Counsel for defendants, Todd Friedman, was new to the case at the hearing; he stated that he did not know what the Collateral was but suggested that counsel could work on identifying

---

[2] On August 19, 2024, defendants' counsel James Cinque demanded that Side consent to arbitration.  Cinque Decl. ¶ 6, Ex. 9.  Side said it would consider the proposal, and after discussing the matter in early September, Side said it would consider arbitration for claims arising out of the MSA, but not the Note or the Security Agreement, because the Note and the Security Agreement contained exclusive jurisdiction clauses placing jurisdiction in the San Francisco courts. *Id.* ¶ 11, Ex. 13; Kevane Decl. Ex. L.

where it was. I issued the TRO to maintain the status quo and instructed the parties that if they could negotiate something narrower that maintained the status quo, they should. The TRO stated the following:

> "IT IS HEREBY ORDERED THAT defendants and their agents, employees and all persons acting in concert or participation with them are restrained and enjoined from leasing, selling, transferring, consigning, auctioning, dissipating, concealing, pledging, granting a security interest in, or otherwise disposing of any assets constituting the Collateral as defined in the Note and Security Agreement and real property. This Order is intended to preserve the status quo. It does not prohibit defendants from paying counsel or expending normal daily living expenses until this matter can be decided on its merits."

Dkt. No. 28 (Temporary Restraining Order and Briefing Schedule). After the TRO hearing, defendants switched counsel again; the parties' efforts to meet and confer were fruitless. Kevane Decl. Exs. Q, R.

At the hearing on the preliminary injunction motion and defendants' motion to compel arbitration on December 18, 2024, I granted Side's motion for a preliminary injunction and issued a short order to that effect on December 19, 2024. *See* Dkt. Nos. 75 (minute entry for December 18, 2024, hearing), 76 (Preliminary Injunction Order). I did not rule on the defendants' motion to compel arbitration.

## LEGAL STANDARD

### I.  MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration. 9 U.S.C. §§ 1 et seq. Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted).

If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "Any doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999).

## II. REQUEST FOR PRELIMINARY INJUNCTION

Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders. Fed. R. Civ. P. 65. A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## DISCUSSION

## I. MOTION TO COMPEL ARBITRATION

Three contracts between the parties are at issue here. The question is which one gives rise to Side's claims and accordingly determines jurisdiction for the underlying dispute. This court has exclusive jurisdiction over disputes arising from the Restated Agreements, and Side's claims are fundamentally rooted in them, not the MSA. Defendants' motion to compel arbitration is denied.

### A. The Contracts in Relation to One Another

The earliest contract between the parties was the initial MSA, executed on August 2, 2021, which contained an arbitration provision covering any disputes arising from or connected in any way with the MSA. *See* Dkt. No. 37-1, Ex. 1 (Initial MSA, executed and effective August 2, 2021). The MSA was amended a year later. *See* Dkt. No. 37-1, Ex. 4 (First Amended MSA, executed and effective August 1, 2022). The First Amended MSA anticipated that the defendants would execute a promissory note in Side's favor. It maintained the arbitration provision from the initial MSA.

9

The First Amended MSA was a separate document from the initial promissory note. It states that the promissory note, *when it was eventually created*, would be secured against the Alexanders' assets, and would be immediately payable in full if the Alexanders at any point "disassociate their real estate licenses from Side." Dkt. No. 37-1, Ex. 4. The parties entered the initial promissory note on August 11, 2022, ten days after executing the First Amended MSA. Compl. ¶ 16. The terms of the initial promissory note required that payment be made on a particular schedule, and the defendants defaulted one year later when they failed to meet that payment schedule. Compl. ¶ 17.

After the defendants defaulted, the parties executed the Restated Agreements in April 2024. *See* Dkt. No. 37-1, Exs. 2 (Amended and Restated Promissory Note, executed and effective on April 18, 2024), 3 (Amended and Restated Security Agreement, executed and effective on April 18, 2024). Unlike the MSA, the Restated Agreements contained "Governing Law" provisions, which I will refer to as exclusive jurisdiction clauses, providing that any dispute arising out of the terms of the Restated Agreements will be subject to the exclusive jurisdiction of the San Francisco courts. *See* Dkt. No. 37-1, Exs. 2, 3. The Restated Agreements also contain "Conflicting Agreement" clauses, which provide that in the event of an inconsistency between the terms in the Restated Agreements and any other agreement to which the parties are subject (including the MSA), the terms of the Restated Agreements prevail. *See id.*, Exs. 2, 3.

### B. Side's Claims Are Rooted in the Restated Agreements, not the MSA

To determine whether the terms of the MSA (specifically, its arbitration provision) apply to Side's claims under California law, I must consider whether Side's claims "have their roots" in the relationship between the parties that was created by the contract at issue. *See Berman v. Dean Witter & Co., Inc.*, 44 Cal. App. 3d 999, 1003 (Cal. Ct. App. 1975). The MSA directed the parties to execute a promissory note according to conditions that the MSA laid out, including a specific Event of Default: license disassociation. The defendants argue that this roots Side's claims in the MSA and Side's claims should therefore be governed by the MSA's arbitration provision. *See* Motion to Compel Arbitration ("Arbitration Motion") [Dkt. No. 37] 9:18-27 (citing *Berman*, 44 Cal. App. 3d at 1003). Their argument is unpersuasive.

10

Side's claims are for breach of the Note (Claim One) and breach of the Security Agreement (Claim Two).  The Note required the payment, and obligations regarding the Collateral rest in the Security Agreement.  These are separate contracts.  Just because the First Amended MSA anticipated and directed that a promissory note and security agreement be executed between the parties, *see* First Amended MSA ¶ 9, does not mean that disputes arising out of the Restated Agreements, which have their own exclusive jurisdiction and conflicting agreements clauses, are subject to the MSA's arbitration provision.  For the defendants' first argument in favor of arbitration to prevail, I would have to treat the MSA as if it *were* the Note and Security Agreement.  I cannot do that.  The MSA was not itself a promissory note, nor was it a security agreement.

The Restated Agreements are what give rise to Side's claims.  The Complaint makes this clear.  *See* Compl. ¶¶ 47-59 (Claim One) (alleging that Official Partners and the Alexanders *breached the Amended and Restated Secured Promissory Note* by defaulting on the Note and then "refusing to provide assurances that [the Alexanders as Guarantors] had performed all acts that may be necessary to maintain, preserve, protect and perfect the applicable Collateral, the lien granted herein and the perfection of such lien" per § 3(a) of the Security Agreement"); ¶¶ 60-65 (Claim Two) (alleging that the Alexanders breached *the Amended and Restated Security Agreement* when Official Partners defaulted on the Note due to the Alexanders' real estate licenses being disassociated from Side, which constituted a simultaneous "Event of Default" under the Security Agreement § 4(a), and alleging that the Alexanders also breached § 3(a) and 3(e) of the Security Agreement when they failed to provide assurances with respect to the Collateral).  As such, the exclusive jurisdiction clauses contained within both Restated Agreements apply, and I have exclusive jurisdiction over Side's claims for breach of contract.

And, not to put too fine a point on this, the "Conflicting Agreements" clause found in the Restated Agreements serves as further evidence that the parties intended for those agreements, not the MSA and its mandatory arbitration clause, to dictate how they resolve any contractual conflicts.  *See* Dkt. No. 37-1, Ex. 2 (Amended and Restated Promissory Note) ¶ 9; *see id.* Ex. 3 (Amended and Restated Security Agreement) ¶ 5(l).  Defendants protest that the Conflicting

11

Agreements clause does not apply because no terms in the Restated Agreements "conflict" with the terms of the MSA. They contend that conflict is not between the documents but is rather between the parties, who disagree about whether Side's claims are rooted in the MSA or the Restated Agreements. But the presence of the Conflicting Agreements clause in the Restated Agreements evidences that the parties considered what might happen if the MSA and Restated Agreements were to be pitted against each other: the Restated Agreements would prevail. Moreover, the language of the Conflicting Agreements clause is clear that it applies where there are *inconsistencies* between the Restated Agreements and other contracts between the parties, not necessarily outright conflicts. *See* Note § 9; Security Agreement § 5(l). So even if I were to assume for the sake of argument that Side's claims for breach of contract arise from *both* the MSA and the Promissory Note, the Conflicting Agreements clause would lead me to follow the exclusive jurisdiction clause in the latter contract, not the arbitration clause in the former.[3]

### C.      The Promissory Note and Security Agreement are Not Illegal Contracts

The California Financial Code states that "[n]o person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." *See* Cal. Fin. Code § 22100(a). Side qualifies as a "person" as it is a corporation. And because the purpose of the loan was to allow Official Partners to invest in its business (which is the Alexanders' business), for an amount over $5,000, the Note is considered a "commercial loan" governed by Chapter 3 of the California Financial Code. *See* Cal. Fin. Code § 22502 (defining "commercial loan" as "a loan of

---

[3] In addition, under California law the meaning of a contract must be derived from reading the whole of the contract "in order to give effect to all provisions and to avoid rendering some meaningless." *Zalkind v. Ceradyne, Inc.,* 194 Cal. App. 4th 1010, 1027 (2011); *see* Cal. Civ. Code § 1641 (providing that the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable). The defendants' argument fails to account for this basic principle of contract interpretation. *See*, e.g., *Turlock Irrigation Dist. v. FERC*, 903 F.3d 862, 872 (9th Cir. 2018) (refusing to interpret a contract in such a way that would render one of its provisions meaningless); *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc*., 971 F.2d 272, 278–79 (9th Cir. 1992) (rejecting interpretation of contract that "violates a fundamental rule of contract interpretation because it would render other portions of the contract meaningless" (citing Cal. Civ. Code § 1641)). If I were to accept their interpretation of the contracts, I would be rendering the Governing Law and Conflicting Agreements provisions of the Restated Agreements effectively meaningless. The defendants' argument would seemingly compel all disputes arising out of the Note to arbitration because the MSA mentions the Note even though the Note was executed later and has a conflicting provision.

12

a principal amount of five thousand dollars ($5,000) or more . . . the proceeds of which are intended by the borrower for use primarily for other than personal, family, or household purposes").

The defendants contend that Side was required to register as a licensed lender under the California Financial Code, Cal. Fin. Code § 22000 et seq., before it issued the Note, and that Side failed to do so. Defendants conclude that this renders the Restated Agreements unenforceable illegal contracts, leaving the MSA (with its arbitration provision) as the only enforceable contract that exists between the parties. *See* Arbitration Motion 11-12; Opposition to Preliminary Injunction ("Preliminary Injunction Oppo.") [Dkt. No. 38] 9-10.

Courts in this circuit have considered and rejected this exact argument. *See e.g.*, *Cent. Valley Ranch, LLC v. World Wide Invs., LLC II*, No. 1:10CV00020 LJO DLB, 2012 WL 217685, at *4 (E.D. Cal. Jan. 24, 2012), *report and recommendation adopted*, No. 1:10CV00020 LJO DLB, 2012 WL 487046 (E.D. Cal. Feb. 14, 2012); *WF Capital, Inc. v. Barkett*, 2010 WL 3064413, *5–6 (W.D. Wash. Aug. 2, 2010). The reason is that the California Financial Code does not contain a remedy that can void a commercial loan: the penalties related to commercial loans are contained in Cal. Fin. Code Chapter 4, Article 3 ("Commercial Loan Penalties"), which has no provision that voids commercial loans made by unlicensed lenders. Though California Financial Code section 22750 voids certain illegal "consumer loans," it does not contain an analogous provision for commercial loans like the one in this case.

In *Cent. Valley Ranch, LLC*, the plaintiffs alleged, among other things, that their contract with defendants was illegal because the defendants were acting as an unlicensed lender; the plaintiffs sought recission. They argued that the California Financial Code (specifically, Cal. Fin. Code sections 22750-53, and 22780) governs the finance lenders market and provides relief for parties to unlicensed loans by voiding contracts and providing civil and criminal penalties for violative contracts. *See Cent. Valley Ranch*, at *4-5. They claimed that since the defendants were not licensed to do business in California under California Corporations Code section 2105 and were not authorized lenders under the California Financial Code, their contracts with the plaintiffs were illegal and void under California law. *See id.*, at *4. But the court rejected their argument,

13

1    explaining that while those sections of the California Financial Code provide a voiding remedy for

2    *consumer* loans made by unlicensed lenders, they do not provide a similar remedy for unlicensed

3    commercial loans, and for that reason, the plaintiffs could not prevail on a claim for recission. *See*

4    *id*.

5          The court in *Cent. Valley Ranch* followed the analysis in *WF Capital, Inc. v. Barkett*, 2010

6    WL 3064413 (W.D. Wash. Aug. 2, 2010), which I also find to be sound.  There, the defendants

7    contended that certain commercial loan agreements were void under California law because the

8    lender was not registered to transact business in California and was not licensed as a lender there.

9    The court found that the defendants' contention was unsupported by the California Corporations

10   Code and the California Financial Code, neither of which provide a voiding remedy for unlicensed

11   commercial loans.  *See WF Capital*, at *5-6.

12         Here, the defendants invoke the same sections of the California Financial Code as the

13   plaintiffs did in *Cent. Valley Ranch*, arguing that the Restated Agreements governing the

14   commercial loan that Side provided are illegal contracts because Side failed to register as a lender

15   as mandated by California state law.  Their argument suffers from the same deficiencies as did the

16   plaintiffs' argument in *Cent. Valley Ranch* and the defendants' argument in *WF Capital*.  The loan

17   at issue here is a commercial loan, and the provisions of the California Financial Code that the

18   defendants point me toward offer no voiding remedy for unlicensed commercial loans.[4]

19         In their Reply and at oral argument, defendants attempted to distinguish their position from

20   the losing arguments in *Cent. Valley Ranch* and *WF Capital* by pointing out that they "are not

21   arguing that they have a remedy or affirmative defense under the California Finance Laws," as

22   were the plaintiffs in *Cent. Valley Ranch* and defendants in *WF Capital*, respectively.  *See* Reply

23   2-3.  That distinction, such as it is, is immaterial for the purpose of this analysis.  The context in

---

[4] Defendants try to analogize this case to others where courts have refused to enforce "illegal contracts," but the analogies come up short.  This case is not like *Agum v. Gavras*, 236 Cal. App. 4th 91 (Cal. Ct. App. 2015), where the court found an agreement procured by way of a fiduciary duty breach is an unenforceable illegal contract.  Nor is it comparable to *WRI Opp. Loans II, LLC v. Cooper*, 154 Cal. App. 4th 525 (Cal. Ct. App. 2007), where the court enforced the long-accepted (but here, inapplicable) rule that because an illegal contract is void, "it cannot be ratified by a subsequent act, and no person can be estopped to deny its validity[.]"

which the defendants' argument is offered is of no consequence; its defect is that the defendants have not shown that the California Financial Code provides for the voiding of unlicensed commercial loans in the manner that the defendants describe. That Side failed to register as a licensed lender in California does not render the Restated Agreements illegal.

\*\*\*

As discussed, Side's claims are "claims, controversies or disputes arising under or in connection with" the Restated Agreements. Those agreements contain Governing Law provisions specifying that this court has proper and exclusive jurisdiction to hear claims "arising under" their terms. They are not illegal. The defendants' motion to compel arbitration is DENIED.

## II. PRELIMINARY INJUNCTION MOTION

After the parties entered into the Restated Agreements, which pledged the Alexanders' assets to Side as collateral for the loan that Side provided Official Partners, Side says that the defendants violated the terms of the Restated Agreements: the Alexanders' licenses were disassociated, they moved or concealed the Collateral in violation of the Restated Agreements, and they refused to identify it or state where it is located or what condition it is in. Accordingly, I entered a preliminary injunction on December 19, 2024, the terms of which are laid out in the Preliminary Injunction Order at Dkt. No. 58.

The defendants opposed the preliminary injunction on three grounds: the matter should be arbitrated; the Restated Agreements are "illegal, unenforceable loans provided by an unlicensed lender"; and, Side has not shown that defendants are in breach, and as such, has failed to show that it is likely to prevail on the merits of its claims. I have addressed and rejected the first and second arguments above. The third argument also comes up short.

### A. There are Serious Questions Going the Merits of Side's Case

To establish a breach of contract under California law, a claimant must show: "(1) the contract, (2) the [claimant's] performance or excuse for nonperformance, (3) [the opposing party's] breach, and (4) the resulting damages to [the claimant]." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 228 (Cal. Ct. App. 2014).

Earlier, I explained that the contracts at issue are the Restated Agreements, and they are

15

not illegal. *See* discussion *supra*, Section I(B), (C). There are at least serious questions going to the merits of Side's breach claims. While the Alexanders insist that Side preemptively breached the MSA by disassociating the Alexanders' licenses, Side's version of the facts as summarized in Background B, *infra*, is more than plausible. The disassociation of the Alexanders' real estate licenses from Side occurred at the direction of Official Partners, with the Alexanders' full awareness and consent following their being named in sexual assault complaints. Compl. ¶¶ 29-32. That disassociation triggered certain obligations under the Restated Agreements with which the defendants failed to comply.

Under the terms of the Security Agreement, the Alexanders were required to "perform all acts that may be necessary to maintain, preserve, protect and perfect the applicable Collateral, the Lien Granted herein and the perfection of such Lien" and "to procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by the Company to perfect, maintain and protect its Lien hereunder[.]" Security Agreement §§ 3(a), 3(e). The Alexanders represented that the Collateral securing the Note would be held at 110 E. 25th Street, New York, NY 10010, and that they would not change that location or change their primary residence without first notifying their lender, Side.

The defendants appear to have done none of these things. According to Side, the Alexanders refused to provide assurances that the Collateral had been preserved and refused to deliver a list of the Collateral to Side, as is required by §§ 3(a) and 3(e) of the Security Agreement. Compl. ¶¶ 40-44. The defendants also refused to make the payment that is required by the terms of the Note after an Event of Default. *Id.* ¶¶ 47-55.

The defendants protest that Side offers "no evidence" for its allegation that the Alexanders breached the Restated Agreements by disassociating their real estate licenses from Side. *See* Preliminary Injunction Oppo. 12-13. But Side is not claiming that breach occurred when the Alexanders' disassociated their licenses; it is claiming that breach occurred when the defendants failed to act in accordance with the terms of the Restated Agreements once the purported Event of Default occurred. *See* Compl. ¶¶ 47-55 (explaining that Official Partners *defaulted* on the Note

16

when the Alexanders disassociated their licenses, and then the Alexanders *breached* the Security Agreement when they refused to provide assurances that they, as Guarantors, were preserving the Collateral that secured the Note, and all defendants *breached* the Note when they refused to make the payment that is required by the Note in the event of a default).

Further, the defendants' "no evidence" argument is contradicted by exhibits that the defendants themselves have provided. *See e.g.*, Cinque Decl. ¶ 8, Exhibit 11 (August 19, 2024, email from James Cinque to Catherine Kevane in response to Side's letter dated August 7, 2024, stating: "Your demand that the Alexanders provide unspecified information under Section 3 of the amended and restated security agreement dated April 18, 2024 is rejected."). Indeed, the defendants concede in their opposition that they have not complied with the terms of the Security Agreement. Oppo. 14 ("The Alexander Defendants remain ready to procure, execute, and deliver the documents to Plaintiff as required under Section 3(e) of the Security Agreement[.]").

Finally, the defendants do not dispute that the Alexanders' real estate licenses were disassociated from Side; they merely contest who initiated that disassociation. That is not enough to avoid the injunction given the disputed explanations by the parties and the risk of harm Side faces in its absence. What is undisputed is that the Alexanders' licenses were disassociated from Side, the Restated Agreements allow Side to demand the total balance of the Note if the licenses are disassociated from Side, Side did demand the total balance, that balance has not been paid, and the defendants have not sufficiently identified or secured the Collateral as they are obligated to do per the terms of the Restated Agreements. Side has shown that there are at least serious questions going to the merits of its claims for breach of contract.

**B.     Side Has Shown a Risk of Irreparable Harm Absent a Preliminary Injunction**

As noted earlier, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). That is the situation here.

The status of the Collateral prior to my issuing the preliminary injunction was not then, and is not now, by any means certain. For one, when the parties entered into the Restated

17

1   Agreements in April 2024, the Alexanders (as Guarantors for the Note) represented that the
2   records of the Collateral and the Collateral itself (meaning, their assets), would be kept at 110 East
3   25th Street, New York, New York, 10010.  *See* Oppo. to Preliminary Injunction Motion at 4, 14;
4   *see also* Dkt. No. 37-1, Ex. 3, Section 2(d).  Defendants concede that Official Partners has not
5   been located at that address for at least two years, arguing that since Side apparently knew in
6   October 2022 that Official Partners was no longer at 110 East 25th Street and did not inform the
7   defendants that this would breach the terms of the Security Agreement, it has "waived" the
8   requirements of Section 2(d) of the Security Agreement.  *See* Oppo. 14.  Defendants are welcome
9   to raise that defense later, but it does not show that they complied with the Security Agreement.

The Alexanders also refuse to comply with the terms of the Security Agreement that require them to "perform all acts that may be necessary to maintain, preserve, protect and perfect the applicable Collateral" and "procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by the Company to perfect, maintain and protect its Lien hereunder[.]"  *See* Security Agreement §§ 3(a), 3(e).  In opposing the injunction, the Alexanders did not contend that they are maintaining, preserving, and protecting the Collateral; they merely claimed that they remain "ready" to do so, as they acknowledge is required by the Security Agreement.  *See* Preliminary Injunction Oppo. 14.  And Side points out that the Alexanders have rejected its attempts to compel the production or identification of the Collateral on multiple occasions.  *See* Reply ISO Preliminary Injunction [Dkt. No. 45] 2-3 ("[T]he Alexanders have rejected requests to [procure, execute, and deliver the documents deemed necessary to protect the Collateral] on multiple occasions, including in response to the instant motion and in response to Side's meet and confer efforts following the November 8, 2024 hearing on Side's ex parte application for temporary restraining order at which Defendants' counsel represented they "can work, counsel to counsel on identifying what the collateral is and where it's located.").

The Alexanders submitted declarations stating that their equity interests in Official Partners, which are the only Collateral they identify, will not change during the pendency of the lawsuit, and that they will not dissipate "any assets" that they "know to be considered collateral"

18

except for to pay counsel and to pay for ordinary living expenses. *See* Dkt. Nos. 38-3, 38-4 (the Alexanders Declarations). These declarations merely mirrored the language of the TRO that I issued prior to the hearing on the preliminary injunction. They do not provide the kind of protection that Side needs while it adjudicates its breach of contract claims.

There is reason to believe that the assets securing the Note are at risk of dissipation during the pendency of this lawsuit. The status of the Alexanders' assets is by no means predictable.[5] I granted Side's request that I issue a preliminary injunction preventing the dissipation of the Collateral and real property until Side's claims are adjudicated because it showed good cause for the protection.

### C.  Other Factors

The balance of equities tips sharply in Side's favor because the defendants continue to avoid the questions of what and where the Collateral is. A $5,000,000 loan is in the balance. The Alexanders have declared that they will not dissipate what they understand to be the Collateral during the pendency of this lawsuit. *See* Alexanders Declarations [Dkt. No. 38]. As a result, it is not overly burdensome to enjoin them from dissipating it. Side has reason to fear that it will be irreparably harmed before a resolution on the merits of this dispute in light of the Alexanders' alleged breaches and conduct. And the public's interest is served by requiring that the Collateral be preserved until this matter is resolved.

### CONCLUSION

For the foregoing reasons, the defendants' motion to compel arbitration is denied. Side's request for a preliminary injunction remains in place.
**IT IS SO ORDERED.**

Dated: January 13, 2025

William H. Orrick
United States District Judge

---

[5] Side filed an administrative motion for leave to file supplemental material in further support of its motion for preliminary injunction. Dkt. No. 53. The defendants opposed Side's motion. Dkt. No. 54. I granted Side's motion without consideration of the supplemental material it sought to include. Accordingly, Side's administrative motion is denied as moot.